Filed 10/13/20  In re M.W. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.W. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E074844 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1800655) |
| v. | OPINION |
| L.W., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Cheryl C. Murphy, Judge.

Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

On February 4, 2020, the juvenile court terminated L.W.'s (mother) parental rights to her three daughters, Me., Mi., and My., under Welfare and Institutions Code[1] section 366.26. Mother appeals, contending the court erred by finding the beneficial parent-child relationship exception to adoption did not apply. We reject her contention and affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

### A. Detention.

On August 22, 2018, the family came to the attention of the Riverside County Department of Public Social Services (DPSS) when three-year-old Mi. (born May 2015) was found walking on the street without an adult. Upon the child's return, mother reported that she had left Mi. and My. (born July 2018) in the care of K.B. (father), and he had fallen asleep. Mother agreed not to leave the children in father's care, and he agreed to stay awake while caring for the children.

On September 25, 2018, mother brought My. to the emergency room for lethargy and thrush. Subsequent tests revealed the infant had multiple broken ribs, a collapsed lung, a break to her lower arm, fractures on both sides of her face, bruising and trauma all over her body, and a spleen laceration. Her injuries were at different stages of healing and did not appear accidental. The doctor opined that My. had been abused "every day or nearly every day of her life."

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

When interviewed, mother said she lives with My. and father, as well as her two daughters, Me. (born Jan. 2008) and Mi. Mother reported her belief that father must have physically abused My. because he cared for the girls when she was at work, and he was "physically and emotionally abusive towards her." She stated that when she decided to bring the infant to the emergency room, father repeatedly discouraged her from doing so. Mother reported that father consumes beer daily and smokes marijuana regularly. Regarding her other daughters' biological fathers, mother stated that Me.'s father (K.S.) has never met Me. or provided care or support, and Mi.'s father (M.M.) is not involved, but he does send monthly child support checks.[2] On September 26, 2018, in his interview, father denied any knowledge of how My.'s injuries occurred, denied recent use of marijuana, claimed to only drink one to two beers a day, and confirmed that he and mother are the only caregivers for My.

On October 4, 2018, DPSS filed a dependency petition under section 300, subdivisions (a) (serious physical harm as to My. only), (b)(1) (failure to protect as to all the girls), (e) (severe physical abuse as to My. only), (g) (no provision for support as to Me.& Mi. only), (i) (cruelty as to My. only) and (j) (abuse of siblings as to Me. & Mi. only). The petition alleged that while in the custody of father, My. was physically abused and sustained "severe and non-accidental injuries." On October 5, 2018, the children were detained outside the home, and visitation with mother was limited to Me. and Mi.

_____

[2] Neither K.S. nor M.M. are parties to this appeal and, therefore, they will only be discussed as needed. On July 15, 2019, mother was notified that a paternity DNA test showed K.S. is not the biological father of Me.

3

B.      *Jurisdiction/disposition reports.*

According to the jurisdiction/disposition report filed November 2, 2018, and the addendums filed December 10, 2018, January 4, February 7, March 1, and March 21, 2019, father was married to another woman who reported domestic violence in their relationship. His family reported that he has a history of substance abuse and "erratic behavior," including an attempt to suffocate the paternal grandmother with a pillow. As a result of the Riverside County District Attorney's Office investigation into My.'s injuries, father was arrested. On January 28, 2019, father was charged with torture (Pen. Code, § 206), and both father and mother were charged with willful child cruelty (Pen. Code, § 273a). It was further alleged that father personally inflicted great bodily injury. (Pen. Code, §§ 12022.7, subd. (a), 1192.7, subd. (c)(8).)

The social worker met with mother on November 8, 2018. In response to learning about father's past, mother was "extremely upset" and "questioned how honest he was throughout the course of their relationship." She was not surprised to learn he was violent with his wife and disclosed "domestic violence in their relationship." Due to concerns for her own safety, and because of the injuries My. had sustained, mother informed the social worker that she no longer resided with father. On December 21, 2018, the social worker was informed that mother was pregnant. In January 2019, mother learned there was a warrant for her arrest for willful child cruelty.

On February 8, 2019, mother told the social worker that she had not spoken with father since November 2018. However, this contradicted information the social worker had received from a district attorney investigator on January 30, 2019. The investigator

4

shared his "concerns regarding the mother, as she lied about not having any contact with [father]." He stated that mother had been in constant communication with father (via text messages) during January 2019. When the social worker confronted mother with this information, she downplayed their conversations. She also denied telling father that she loved him, but this again contradicted the information received from law enforcement. Mother explained that she had kept in contact with father "in order to see if he would admit to [My.'s] injuries." The social worker expressed concern regarding mother's lack of honesty for the past three months and informed mother that it could affect DPSS's recommendation.

The social worker reported that mother had been referred to, and was participating in, parenting classes, a medication evaluation, individual therapy, and domestic violence education. In the beginning, mother "actively engage[d] in services" and was "very conscientious regarding her children." However, because of mother's lies regarding her contact with father, the social worker opined that mother "appears to lack insight as to why continued contact with [father] and being dishonest with both [DPSS] and her service providers is detrimental to her children's safety." The social worker expressed concern that "mother's choice to continue contact with [father], despite previously stating there were 'red flags' in their relationship, indicates that she is not willing to ensure that both she and the children would be safe from [father] in the future."

Regarding visitation, mother "demonstrated excellent parenting skills" with Me. and Mi., who were "extremely bonded" to her. Initially, the social worker noted Me.'s mental health "has deteriorated since being placed into foster care, as evidenced by a

5

change in her demeanor as well as her statements that she wants to harm herself."[3] However, as of January 25, 2019, Me. "denied having any further thoughts of wanting to hurt herself." DPSS considered recommending supervised visitation between mother and My., along with reunification services, but decided against such recommendation given mother's actions regarding father. A contested jurisdictional hearing was set for March 27, 2019.

###### C. Contested jurisdiction/disposition hearing.

On March 27, 2019, the social worker testified that mother had (1) completed parenting classes, (2) participated in individual counseling, (3) completed psychological and medication evaluations, (4) maintained consistent contact with Me. and Mi, (5) enrolled in a domestic violence program, and (6) continued to work full time. She further testified that mother had engaged in 35 phone calls and 150 text messages with father. Because mother had maintained contact with father and then lied about it, the social worker expressed concern for the children's safety if they were to reunify with her. The court ordered the first amended petition filed, found that "ICWA"[4] does not apply, struck the allegations g1 and g2, determined that Me. and Mi. came under section 300, subdivisions (b)(1), and (j), and My. came under section 300, subdivisions (a), (b)(1), (e),

---

[3] When the social worker met with Me. regarding her statements, Me. "shared that she wanted to hurt herself because her friends did not want to play with her, sharing that her 'best friends had a new friend,' indicating that she did not get along with their new friend."

[4] The Indian Child Welfare Act of 1978. (25 U.S.C. § 1901 et seq.)

(i), and (j), and continued the disposition hearing. The first amended petition was filed on March 27, 2019.

At the continued disposition hearing, the social worker testified that she had received a transcript of mother and father's calls and text messages, which show that both parents expressed love for each other, mother had made food for father, and father had visited mother. The court admitted the call log and text messages into evidence. With the agreement from all parties, the contested disposition hearing was continued to May 7, 2019.

Prior to the hearing, DPSS filed an addendum report on April 12, 2019, which included a copy of mother's psychological assessment by Robert L. Suiter, Ph.D, Psy.D. Dr. Suitor confirmed a history of domestic violence between mother and father. He expressed concern that mother had "difficulty being open and honest with the psychological testing. [And, despite] two strong admonitions about the importance of being truthful, open, and honest with the testing, . . . five objectively scored instruments were invalid due to her heightened degree of defensiveness or her heightened degree to present herself favorably." Dr. Suiter determined it was "inconclusive" as to whether mother could benefit from services and be able to care for her daughters. Mother's therapist reported that treatment was "'just at the beginning'" and she "'ha[s] a ways to go.'" The therapist voiced concern about mother's contact with father and opined that her description of such contact "'lacked authenticity.'" Mother was to begin services at Perris Valley Recovery Programs on April 16, 2019.

According to the addendum report filed May 2, 2019, all three children were placed in the same foster family home with a caregiver who was "willing to provide permanency to the children." Mother was arraigned on the charge of willful child cruelty (Pen. Code, § 273a), and a settlement conference was scheduled for May 22, 2019. DPSS reported that since mother "has still failed to take responsibility for her actions, as she denied the concerns that were noted by Dr. Suiter in the psychological assessment," "it would not be in the children's best interest for [her] to be granted Family Reunification Services, as [she] fails to realize the impact of both her actions and [father's] actions that led to [DPSS's] involvement."

On May 7, 2019, the juvenile court found by clear and convincing evidence that removal of the children from parents' custody was warranted. Mother was denied reunification services pursuant to section 361.5, subdivision (b).[5] The court described My.'s extensive injuries, the fact that only mother and father cared for the infant,

---

[5] "Reunification services need not be provided to a parent . . . when the court finds, by clear and convincing evidence" that an exception set forth in section 361.5, subdivision (b)(5), (6) or (7) applies. (§ 361.5, subd. (b).) Section 361.5, subdivision (b)(5) authorizes the court to deny reunification services to a parent when the child has been brought within the jurisdiction of the court under section 300, subdivision (e), which applies when "[t]he child is under the age of five years and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." The exception set forth in section 361.5, subdivision (b)(6), allows the court to deny reunification services when "the child has been adjudicated a dependent . . . as a result of . . . the infliction of severe physical harm to the child, a sibling, or a half sibling by a parent or guardian . . . or of another individual . . . with the consent of the parent or guardian . . . ." (§ 361.5, subd. (b)(6)(A), (C).) The exception set forth in section 361.5, subdivision (b)(7), allows the court to deny services when "the parent is not receiving reunification services for a sibling or a half sibling of the child pursuant to paragraph . . . (6)." (§ 361.5, subd. (b)(7).)

mother's failure to point out My.'s injuries to the emergency room staff despite their obvious visibility, and mother's failure to be truthful to DPSS and her service providers about her relationship with father. Noting that mother was pregnant with another child by father and was close to giving birth, the court stated its belief "that had father not been arrested, she would have likely continued the relationship with him." The court opined that mother has shown a "lack of insight into the gravity of the situation at hand and has failed to show that she is addressing the concern that brought the case" to the court's attention. Thus, the court expressed "grave concern that [mother] would not be protective to these children should she reunify, and they be returned to her." Finding that mother knew or should have known about the abuse of My. and that the exceptions to granting reunification services pursuant to section 361.5, subdivision (b)(5), (6), and (7) apply, the court removed the children; denied mother reunification services; and set the section 366.26 hearing. Mother was allowed weekly supervised visitation with Me. and Mi. only.

On May 14, 2019, mother filed a writ petition, which this court denied. (See *L.W. v. Superior Court* (*DPSS*) (Aug. 27, 2019, E072732) [nonpub. opn.].)

D. *Sections 366.26 and 366.3 review reports and hearing.*

According to the sections 366.26 and 366.3 reports filed August 23, 2019, the children had been living in the same foster home since April 18, with a caregiver who was willing and able to adopt them. Me., who was 11 years old, stated that if she could not return to mother, she wished to remain in her current placement. A maternal aunt was being assessed for placement through the Interstate Compact on the Placement of

9

Children (Fam. Code, § 7900 et seq.) in the State of Pennsylvania. Mother continued to participate in weekly, supervised visits with Me. and Mi., and she brought her newborn son to the visits.[6] A concurrent planning review found that the children were adoptable. DPSS requested the section 366.26 hearing be continued for 120 days to allow for the assessment of the maternal aunt. On September 4, 2019, the hearing was continued.

In its addendum report filed December 24, 2019, DPSS recommended the juvenile court proceed with the termination of parental rights. DPSS provided a preliminary assessment of the children's current caregiver for adoption purposes. According to the assessment, Me. was participating in a coping skills group therapy program, and her therapist reported that she had indecisive thoughts on permanency and adoption because she is attached to mother. Nonetheless, Me. did not want to move out of state with relatives. She indicated that if she could not be with mother, "it would be good to be adopted by" her caregiver. Me. said she felt safe and cared for in her current placement. Mi. and My. were too young to understand the concept of adoption, but Mi. reported that her placement was good and her needs are met. My. appeared bonded and content with the caregiver. The caregiver "presented with maturity and motivation to adopt," described "herself as happy, easy going, with a good heart," and reported having good family values. She has four adult children, one 14-year-old child, and stated she is close to her children, grandchildren, sister, and remaining parent.

---

[6] E.B. was born in June 2019. He was placed in a different foster home.

10

According to the addendum report filed December 27, 2019, the referral for placement of the children with the maternal aunt in Pennsylvania was "denied and closed . . . , due to lack of cooperation with completing the foster care certification." The children's caregiver remained open to adopting all three girls and was willing to "continue the visits with the mother and children post adoption."

E.  *Section 388 petitions.*

On January 7, 2020, mother filed section 388 petitions requesting that the court grant reunification services for six months and transition the children back into her care and custody. She reported that she had (1) been granted reunification services in E.B.'s case (with authorization to have him returned to her care and custody); (2) substantially complied with her case plan and completed several services; (3) established suitable housing; (4) maintained employment; and (5) maintained quality visitation with her older children. Regarding the best interests of the children, she stated she had been "engaged in programs to benefit her situation." She further said that once her youngest child was born, she would continue "on the path to successful reunification with him" and would "use the tools" she had gained to "successfully reunify" with her daughters. Additionally, she indicated that her criminal case would conclude shortly, with her "receiving probation and no custody time."

A contested section 366.26 hearing was set, to be heard with mother's section 388 petitions.

*F.     Sections 388 and 366.26 hearing.*

On January 22, 2020, the social worker testified that mother had made significant progress in her reunification services and had benefited from them.  Regarding visitation between mother and Me. and Mi., she described mother as "very attentive" and having a "good relationship with both of them."  She depicted the relationship between mother and the girls as "very loving" and "positive."  In chambers, Me. testified that she enjoyed spending time with mother, that she was able to talk to her freely, and said they have a good relationship.  She wanted to live with mother because she loves "her a lot" and because mother keeps her safe.  If Me. could be home with mother, her half sisters, and half brother, she said she would be "1,000 percent happy."  However, if she could not be with mother, then she wanted to be adopted by her caregiver.

At the continued hearing on February 4, 2020, mother's counsel submitted the following stipulated testimony:  Prior to May 2019, mother participated in parenting classes, anger management classes, and substance abuse classes.  She had learned better parenting and coping skills, was utilizing these skills in her daily life, had maintained sobriety for well over a year, and was participating in peer support services.  After May 2019, when mother was denied reunification services, she participated in domestic violence classes, individual therapy, and recovery services, and she had maintained visitation with the two older girls every week since October 2018.  Mother's son E.B. was in her care and custody from June through August 2019; she receives services for him, with an authorization to have him returned to her home; and she attends every visit and child and family team meeting.  Mother moved into her own residence in October

12

2019. She has "an incredible bond with" Me., who "can discuss anything with her," and will heed her advice. For example, when mother received Me.'s report card for the 2019 school year, mother "had a long talk with [Me.] and explained to her the importance of staying focused, maintaining her concentration, and that school was not there to be a playroom or play around." Mother has an immense love for all of her children. As to Mi., mother has consistently attended weekly visitation, Mi. calls her "mommy," and shows her affection. During visitation, when mother redirects Mi., she "responds appropriately." Mother maintains that it is in the "girls' best interest to have the Court order formal services to reunify with all three girls, just as it is with [E.B.], with the goal of having all four children in her care and custody." With a grant of services, mother "could receive an application for a larger residence to ensure that all four children are in an appropriate residential setting."

Mother's counsel argued that since services had been denied, mother had a baby, has continued to engage in services on her own initiative, has peer support, and is "on the cusp of having [E.B.] returned to her care and custody." He asserted that mother took responsibility for what happened to My. by pleading guilty in the criminal case. In response, My.'s counsel, joined by Me. and Mi.'s counsel, noted there had been no change in circumstances regarding her "protective capacity" because after "receiving counseling and knowing that the father had abused [My.] in such a significant manner, mother did re-engage in contact with father." Regarding My.'s best interest, counsel argued the child "has no relationship with mother." DPSS's counsel joined with the children's counsel, adding that mother had failed to carry her burden of proving "by clear

and convincing evidence that there's changed circumstances, and it's in the minors' best interest to grant [the] requested relief."

The juvenile court denied mother's petitions, explaining that mother had completed services prior to the time they were denied, noting that this case involves "severe physical abuse that occurred to [My.] at the young age of two months," and stating that mother had failed to carry her burden of showing a change of circumstances. The court also found that it was not in the children's best interests since they were in a stable placement, with a caregiver willing to adopt them.

Continuing with the section 366.26 hearing, mother's counsel argued that the application of the beneficial parent-child relationship exception was in the children's best interest because mother had maintained consistent contact with Me. and Mi., and there was a strong emotional connection between mother and Me., whose first choice was to be with mother. DPSS and the children's counsel argued that no exception applied to prevent termination of parental rights. The juvenile court found that the beneficial parental relationship exception to adoption did not apply, terminated all parental rights, and ordered adoption as the permanent placement plan. However, the court noted that the caregiver was willing to continue visitation between mother and Me. and Mi., and added, "I would just indicate to [DPSS] to have the social worker further discuss that with the caregiver."

## II.  DISCUSSION

Mother argues the juvenile court erred in failing to find that the beneficial parent-child relationship exception applied to the termination of parental rights under section 366.26, subdivision (c)(1)(B)(i).  We disagree.

At a permanency planning hearing, once the court finds by clear and convincing evidence a child is likely to be adopted within a reasonable time, the court is required to terminate parental rights and select adoption as the permanent plan unless the parent shows that termination of parental rights would be detrimental to the child under one of several statutory exceptions.  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)  One exception is the beneficial parent-child relationship exception.  (§ 366.26, subd. (c)(1)(B)(i).)

"'To trigger the application of the parental relationship exception, the parent must show the parent-child relationship is sufficiently strong that the child would suffer detriment from its termination.'  [Citation.]  A beneficial relationship 'is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  [Citation.]  The existence of this relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs."'"  (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643 (*Marcelo B.*).)

Thus, the nature of the relationship between the parent and child is crucial in determining the existence of a beneficial parent-child relationship exception; it is not

15

sufficient to show that the child derives some benefit from the relationship or shares some "'emotional bond'" with the parent. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621 (*K.P.*).) "To overcome the preference for adoption and avoid termination of the natural parent's rights, the parent must show that severing the natural parent-child relationship would deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) In other words, the parent must show he or she occupies a "'parental role'" in the child's life. (*K.P.*, at p. 621.)

Appellate courts are divided over the appropriate standard of review for an order determining the applicability of the beneficial parent-child relationship exception.[7] We review the juvenile court's findings on the existence of the relationship for substantial evidence. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.) Whether "the relationship is a 'compelling reason' for finding detriment to the child" is a "'quintessentially' discretionary decision" that we review for abuse of discretion. (*Id.* at p. 1315; see *In re J.S.* (2017) 10 Cal.App.5th 1071, 1080 [applying hybrid standard of review to sibling bond exception].) This record supports the juvenile court's conclusion that the beneficial parent-child relationship exception did not apply.

Turning to the first prong, the juvenile court determined that mother's relationship with Me. and Mi. was not "parental." According to Me., she no longer felt responsible for Mi. because since the girls had been placed in foster care, the foster parents took care

---

[7] The issue is currently pending before our Supreme Court in *In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839.

16

of Mi. "really well" and, thus, Me. no longer had to be a "mom-sister type person anymore." This testimony shows the foster parents, not mother, occupied the parental role in the children's lives. Moreover, while it is undisputed that mother consistently visited Me. and Mi. and had a "positive," "loving" attachment to them, mother acknowledges that they never progressed beyond supervision because of her dysfunctional relationship with father, an abusive partner. However, she argues that her inability to advance beyond supervised visits is "not a reflection of her capacity to give as a mother." But that is not the issue. The issue is her ability to keep the girls safe, given her decision to remain with father and lie about it to various service providers and the social worker. Although we do not dispute the love that Me. has for mother, the evidence does not compel a finding that mother occupies a parental role.

Mother relies on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), but that case is distinguishable. There, a three-year-old child was removed from her father's custody; the father immediately acknowledged his drug use, fully complied with his case plan, and remained drug free. (*Id.* at p. 298.) The child wanted to live with the father and became upset when visits ended. (*Ibid.*) The appellate court concluded the beneficial parent-child relationship exception applied. (*Id.* at pp. 298-299.) *S.B.* does not support mother's claim because, unlike the father in *S.B.*, mother consciously failed to alleviate or mitigate the reason the family had come to the attention of the juvenile court: she had chosen to maintain her relationship with father and then concealed her choice from service providers. Moreover, *S.B.* is confined to its "extraordinary facts." (*In re C.F.* (2011) 193 Cal.App.4th 549, 558.) The same court that decided *S.B.* later stated that *S.B.* "does

17

not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact.  As [*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575] points out, contact between a parent and child will always 'confer some incidental benefit to the child,' but that is insufficient to meet the standard." (*In re C.F.*, at pp. 558-559.)

Regarding the second prong, the case is a close call.  There was significant evidence on both sides of the issue, at least as to Me.  However, after carefully reviewing the record, it cannot be said that the court abused its discretion in concluding that the benefit of adoption outweighed the benefit of maintaining the parent-child relationship.

As described in *Marcelo B.*, the beneficial parent-child relationship exception must be examined on a case-by-case basis, considering the many variables that can affect the parent-child relationship.  Here, Me. (age 12) and Mi. (age 4) have spent most of their lives living with mother; however, for the entire dependency, the girls had relied solely on the foster parents to meet their daily needs.  As mother notes, Me. had trouble being separated from mother during the beginning of this dependency.  But, by the time of the section 366.26 hearing, she was happy, stable, and felt safe in her caregiver's home, and she preferred adoption by her caregiver if she could not live with mother.  More importantly, she did not want to be separated from her sisters, even if that meant she could not return to mother's care.

Nonetheless, mother contends that "[i]t is difficult to imagine a case in which the evidence is more crystal clear that the children would be '*greatly* harmed' if deprived of their *substantial*, positive emotional attachment' with mother."  She asserts that *In re*

*Jerome D.* (2000) 84 Cal.App.4th 1200 (*Jerome D.*) "provides well-suited guidance here." We disagree. In that case, the child "seemed lonely, sad, and . . . 'the odd child out'" in his placement. He wanted to live with his mother and had enjoyed unsupervised night visits in her home. (*Id*. at pp. 1206-1207.) There was no woman in his life other than his mother. (*Id*. at p. 1207.) A psychologist observed the two together and concluded "they shared a 'strong and well[-]developed' parent-child relationship and a 'close attachment' approaching a primary bond." (*Id*. at p. 1207.) He opined that if the relationship were severed, the boy would "grieve and could experience emotional and behavioral difficulties, and that continued contact would benefit him developmentally." (*Ibid*.) The juvenile court "characterized their relationship as 'parental,'" (*ibid*.) and the Court of Appeal concluded keeping parental rights intact would prevent the child's "position as the odd child out in [placement] from becoming entrenched by a cessation of visits and the loss of his mother while [his half siblings] continued to enjoy visits and remained [the mother's] children." (*Id*. at p. 1208.)

Likewise, we reject mother's comparison of her case to that of *In re Amber M*. (2002) 103 Cal.App.4th 681 (*Amber M*.). In that case, the court reversed the termination of parental rights where a psychologist, therapists, and the court-appointed special advocate uniformly concluded "a beneficial parental relationship . . . clearly outweigh[ed] the benefit of adoption." (*Id*. at p. 690.) Additionally, two older children had a "strong primary bond" with the mother, and the younger child was "very strongly attached to her." (*Ibid*.) If the adoptions had proceeded, the children would have been adopted in separate groups. (*Id*. at pp. 690-691.)

In contrast, there is no evidence here that the children shared a primary attachment to mother such that it would be detrimental to sever the relationship. Of mother's three daughters, arguable only one (Me.) shared a primary attachment to her. However, Me. had adjusted well to her current caregiver's home and appeared comfortable in that environment. She was in the same home as her sisters, and all three girls will remain together because they will be adopted by the same caregiver. We do not doubt that mother cares deeply for her daughters and has made progress in addressing some of the issues that led to this dependency; however, unlike *Jerome D.* and *Amber M.*, there is no evidence the children would be "greatly harmed" by the termination of the natural parent-child relationship. (*Angel B.*, *supra*, 97 Cal.App.4th at p. 466.) We therefore conclude that mother has not shown that the juvenile court's findings lacked the support of substantial evidence or that its exercise of discretion rested on an unsupported factual basis. In short, the court properly found that the parent-child relationship exception to adoption did not apply.

## III. DISPOSITION

The orders terminating parental rights are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

CODRINGTON
J.

SLOUGH
J.

20